**Jacob Edward ALLEN, Plaintiff,**

v.

**MARYLAND CASUALTY COMPANY**

and

**State Farm Mutual Automobile Insurance Company, Defendants.**

No. 66–C–3–L.

United States District Court
W. D. Virginia,
Lynchburg Division.

Sept. 22, 1966.

Shuler A. Kizer, Kizer, Hess & Robey, Buena Vista, Va., for plaintiff Allen.

William Rosenberger, Jr., Lynchburg, Va., for Maryland Casualty Co.

Henry M. Sackett, Jr., Williams, Robertson & Sackett, Lynchburg, Va., for State Farm Mut. Auto. Ins. Co.

## FINDINGS OF FACT and CONCLUSIONS OF LAW.

BARKSDALE, District Judge.

This action having been tried upon the facts, without a jury, the court doth hereby find the facts specially, and states separately its conclusions of law thereon, pursuant to Rule 52(a) F.R.Civ.P., as follows:

### FINDINGS OF FACT.

On September 17, 1963, in Amherst County, Virginia, a Ford truck owned and operated by plaintiff, Jacob Edward Allen, was in collision with a Buick automobile owned by George Nutes Ivey and operated by Billy Don Bowden. Thereafter, on January 19, 1965, Allen instituted his action for damages against Ivey and Bowden in the Circuit Court of Amherst County. Shortly afterwards, this action was removed to this Court, and the trial on December 8, 1965, resulted in a judgment in the sum of $11,000.00 for plaintiff Allen against both defendants. It does not appear that George Nutes Ivey had any insurance coverage on his Buick Sedan. There was in force at the time of the accident a policy issued by defendant, Maryland Casualty Company, to plaintiff Allen, which included the Uninsured Motorist endorsement required by Virginia law (Section 38.1–381, of the Code of Virginia). Alleging that the Ivey automobile was an uninsured vehicle, plaintiff Allen instituted this action to recover of Maryland Casualty Company the amount of his judgment, which was within the Uninsured Motorist endorsement's policy limit.

Maryland Casualty Company admitted the fact of its coverage of Allen's automobile for damages which he might recover from injuries by an uninsured vehicle, but denied that the Ivey vehicle was an uninsured vehicle by reason of its allegation that Billy Don Bowden was covered by an insurance policy issued to his father, Heartsel V. Bowden, by State Farm Mutual Automobile Insurance Company. Whereupon, State Farm was impleaded as a party hereto. State Farm has answered, admitting that it had issued its policy to Heartsel Bowden, in force at the time of the accident, which provided amongst other things "such insurance as is afforded by the policy under the coverages A and B * * * with respect to the owned automobile, applies to the use of a non-owned automobile by the named insured or a relative * * * ", with the further provision:

> "Insured—Under coverages A and B * * *—The unqualified word 'insured' includes (1) the named insured and also includes (2) his relatives. * * * "

> "Relative—means a relative of the named insured who is a resident of the same household."

However, State Farm denied liability, alleging that Billy Don Bowden, although a son of its insured, Heartsel V. Bowden, was not a resident of his household and thus was not an Insured within the meaning of the policy; and upon the further ground that neither Ivey nor Bowden, nor any one on their behalf, had complied with the provisions of its policy relating to notice of accidents or notice of claim or suit. By its amended answer, State Farm has alleged that its policy was invalid and insufficient in law to afford coverage to Billy Don Bowden by reason of the misrepresentations and declarations made by Heartsel V. Bowden that there was no operator of the insured vehicle under twenty five years of age a resident of his household.

In the insurance policy issued to Heartsel Bowden by State Farm, the following Policy Conditions appear:

> "In the event of an accident, occurrence or loss, written notice shall be given by or on behalf of the Insured to the Company, or any of its duly authorized agents, as soon as practicable. * * * "

"The insured shall immediately forward to the Company every demand, notice, summons or other process received by him or his representative."

The policy further provides that:

"No action shall lie against the Company (a) unless, as a condition precedent thereto, there shall have been full compliance with the terms of this policy."

Heartsel Bowden was promptly notified of the accident by letter from the Navy authorities dated September 17, 1963, and he confirmed this information by a telephone call to his son, Billy Don, at his Naval Station in Norfolk. On January 25, 1965, a registered letter, enclosing a summons and copy of the motion for judgment in the Allen suit, from the Virginia Division of Motor Vehicles, addressed to Billy Don in care of his father, was received by Heartsel Bowden at his home in Coal City, Ill., and delivered the same day by Heartsel to Billy Don, who then lived in Joliet, Ill. Heartsel Bowden did not think that his policy afforded any coverage for Billy Don. Neither Billy Don, nor the named insured, Heartsel Bowden, ever gave any notice to State Farm that the accident had occurred or that suit had been brought. No report of the accident, or the institution of the damage suit, or notice of any kind, was received by State Farm until more than 18 months after the accident when Maryland Casualty Company on March 24, 1965, wrote to State Farm's agent in Coal City, Ill., informing him of the accident and the institution of the suit. Shortly thereafter, State Farm took non-waiver agreements from the Bowdens, undertook to investigate the accident, and by letter of June 3, 1965, denied coverage.

I find as facts that neither Heartsel Bowden, Billy Don Bowden, nor anyone on their behalf, gave any notice to State Farm "as soon as practicable", and that this failure to give notice resulted in prejudice to State Farm. It is true that Billy Don Bowden promptly admitted that he was at fault in causing the accident, and it is doubtful that prompt investigation by State Farm would have discovered witnesses whose testimony would have prevented a judgment against Billy Don Bowden. It does not appear when Allen retained counsel, but his suit was not instituted until January 19, 1965, 16 months after the date of the accident. Consequently, it appears that State Farm, having received no notice of the accident, was deprived of its opportunity of prompt investigation and also the opportunity to negotiate for a settlement before the institution of the damage suit, and in all likelihood, before Allen had employed counsel.

Billy Don resided with his father and mother until he was 17 years old, at which time the family resided in Coal City, Ill. On March 8, 1961, Billy Don ran away from home because he wanted to quit school and get out on his own for a little while, although his parents wanted him to continue his schooling. There was friction between Billy Don and his father on that account. He first went to live with an aunt in Kankakee, Ill., about 35 miles away. He wrote his parents where he was and visited them occasionally on week ends, but stayed away until about the middle of August. At that time, his father and a Baptist minister, a family adviser, urged him to come home, and he agreed. His parents wanted him to go back to school, but Billy Don wanted to get a job. He tried to find a job, but after his efforts had been unsuccessful for 2½ to 3 weeks, he decided that he wanted to go into the Navy. Consequently, a little over a month after his return home, Billy Don voluntarily joined the Navy on September 25, 1961. He served in the Navy for more than two years, and was, of course, entirely independent of his parents during this time. When he enlisted, he left his clothes and personal effects at his parents' home and gave as his home address his parents' home in Coal City. He spent two leaves of absence with his parents. In mid-September of 1963, he went AWOL. Instead of going home, he came to Lynchburg, where he had friends, and spent twelve days or more

in this vicinity, working a part of the time in apple orchards. Finally, he hitch-hiked from Lynchburg to his parents' home, where he spent one day, and his father took him to Chicago and gave him enough money to travel by rail to his station in Norfolk. Instead, he hitch-hiked until he became involved in the accident on September 17, 1963, which is the basis of this litigation. In December, 1963, he was discharged by the Navy as being unsuitable for Naval service. After being discharged, he returned to Lynchburg, where he stayed a week or more before returning to his father's home in Coal City. He remained in his father's home for less than a month, leaving about January 10, 1965.

The matter of Billy Don's residence in his father's home may be briefly summarized by the following questions and answers on cross-examination in Billy Don's deposition:

"Q. From March, 1961 until you returned home in mid-August of 1961 you were living away from home.

A. Yes, sir.

Q. Then you returned home briefly and went in the Navy.

A. Yes, sir.

Q. Then when discharged from the Navy you were home briefly and you left and have had many different addresses since that time.

A. Yes, sir.

Q. So the only times you were home were just brief periods during the times that I am speaking of—that is, March '61 to August of '61 and from December 1963 when you were discharged from the Navy until right now—the only times you have been home during any of those periods were just brief periods but basically or essentially you were seeking jobs elsewhere and living elsewhere. Is that correct?

A. Just about. I don't think I have lived at home more than two months at a stretch since I left home in '61."

I find as a fact that on September 17, 1963, the date of the accident, Billy Don Bowden was not a resident of his father's household.

## CONCLUSIONS OF LAW.

■ Upon the facts found, my conclusions of law are as follows. Since the contract of insurance was entered into in the State of Illinois, it seems obvious that under Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, Illinois law controls as to the construction to be given the provisions of the policy. Considering first the legal effect of the failure of the insured to give notice of the accident to State Farm as required by the conditions of the policy, I find the following Illinois authorities quite pertinent:

In the case of Simmon v. Iowa Mutual Casualty Co., (1954), 3 Ill.2d 318, 121 N.E.2d 509, an accident occurred on June 30, 1948, and no notice was given by the insured to her insurance company until September 9, 1948. However, the attorney for the injured person, before the institution of a suit, notified the insurance company on August 7, 1948, 38 days after the accident. The issue of whether the insurance company was given reasonable notice was presented to the court, sitting without a jury, who found from the evidence that defendant had been given reasonable notice. On appeal, the insurance company contended that the policy required notice to be given by or on behalf of the insured, and that the giving of the notice by counsel for the injured party was not sufficient. The court held that giving of notice by the injured person was sufficient, and that under the circumstances, the finding of the trial court should not be overruled.

In Hawkeye-Security Insurance Company v. Myers, (7 Cir., Ill.1954), 210 F.2d 890, notice of an accident which occurred on March 31, 1951, was received

on May 5, 1951, 35 days after the accident. The court said (p. 893):

> "The District Court, trying the case without a jury, found that the plaintiff first learned of the accident of March 31, 1951, in which the defendant Willis was injured, on May 5, 1951, thirty-five days after the accident, at which time the insurer received the accident report signed by Myers; that no report of the accident was given by or on behalf of Myers prior to this notice; that the policy in question provided, as the first condition of the insurance agreement, that notice of an accident should be given 'as soon as practicable'; and that such notice was not given as soon as practicable. * * * "

"The provision that the assured shall give timely notice of an accident is a reasonable requirement which is ordinarily inserted in insurance policies covering public liability. Such a notice, if promptly given, enables the insurer to make an investigation of the accident while the circumstances are still fresh in the minds of the parties involved and of the witnesses. *The insurer may thus advise itself as to whether it should settle any claim arising therefrom or whether it should prepare to defend any action which might be brought to recover damages for any injury caused by the accident.* The failure to comply with such a provision, where compliance has not been waived by the insurer, relieves the insurer of liabilities arising out of that accident. Clements v. Preferred Accident Insurance Co., 8 Cir., 41 F.2d 470, 472, 76 A.L.R. 17." (Italics mine.)

The more recent case of Allstate Insurance Co. v. Hoffman, (1959), 21 Ill. App.2d 314, 158 N.E.2d 428, seems particularly analogous to the situation here. While it is a decision of the intermediate appellate court, it does not appear that any appeal was taken from it to the Illinois Supreme Court, so it would seem that it is an authoritative declaration of Illinois law.

Defendant Hoffman had a public liability policy issued by Allstate, which, under certain circumstances, covered his operations of vehicles other than his own. He had an accident while driving a National Guard vehicle while he was on active duty as a member of the Guard. He immediately notified the National Guard investigating officer. When he was sued by the injured parties, he promptly notified National Guard officers, and the Attorney General appeared for him in that suit. In response to an inquiry, Hoffman told the military authorities that he had no insurance, because he did not think his policy covered his liability for this accident. Neither Hoffman, nor anyone for him, reported the accident to Allstate until 23 months after the accident when the Attorney General notified the Company. It was held that the failure of Hoffman to give the notice required by his policy as soon as practicable, justified Allstate's disclaimer of liability. The court said (pp. 432, 433):

> "The remaining contention is whether, if Hoffman had had a right to coverage, it was forfeited by breach of the condition requiring written notice of the accident to be given by or for him to plaintiff as soon as practicable. The contention of the Attorney General seems to be that because Hoffman was of the opinion that the policy did not cover his liability for the accident—an opinion concurred in by his superior officer—his supposed mistake as to coverage was an excusable one for the reason that Hoffman's construction of the policy was identical with plaintiff's. We regard this contention as fallacious; but on the basis of this position the Attorney General urges that it 'was not "practicable" for the defendant to give notice to the plaintiff under a policy that the plaintiff itself reads as not covering the accident.' The requirements of the policy as to notice and the question as to whether the policy affords coverage are separate and distinct matters. Failure of the insured to comply with

provisions with respect to notice justifies a disclaimer of liability on the part of the insurer, even though the insured would have been entitled to the protection had he complied with the notice provisions. It is admitted that plaintiff had no notice of the accident until some twenty-three months had elapsed. There is no evidence that during that period plaintiff had any knowledge of the accident or gave any consideration to the matter of coverage until it had disclaimed because of failure on the part of insured to comply with the policy condition as to notice. We think that the Attorney General is therefore not in a position to urge plaintiff's conclusion that he had no coverage as an excuse for the long delay in giving notice. Hoffman was fully cognizant of the fact of the accident, reported it to the investigating officer of the convoy, and again to his superior officer on arriving at the home armory in Chicago the evening of the day it occurred. He was served with a summons in the Grochowski case the following December and turned it over to his headquarters commander, but at no time did he report the accident to plaintiff. The obvious conclusion justified by the record is that it would have been practicable for Hoffman to give notice on the day following the accident.

"The Attorney General contends that the delay in receiving notice was not prejudicial; he argues that officers of the National Guard, as well as his own office, investigated the occurrence, and he has put himself on record as being willing to turn over to the plaintiff the results of these investigations. In our opinion, this offer does not operate as a substitute for timely notice. Plaintiff has a right to make its own investigation to determine the question of liability, the nature and extent of the injuries sustained by the Grochowskis, the location of the witnesses who might have had first-hand knowledge of the facts and other matters bearing on the defense of the claim. It is common knowledge that insurance companies have a staff of skilled investigators, and without timely notice of the accident the insurer is irreparably handicapped in making its investigation."

See also International Harvester Co. v. Continental Casualty Co., 33 Ill.App. 2d 467, 179 N.E.2d 833, which is generally in accord, although the factual situation was quite different.

■ Having found as a fact that neither Heartsel Bowden, Billy Don Bowden, nor anyone on their behalf, gave any notice of the accident to State Farm "as soon as practicable", I conclude, as a matter of law, that State Farm is justified in disclaiming coverage by reason of the failure of the insured to give the required notice.

Since I have concluded that State Farm has been relieved of coverage, if any there existed, by reason of the failure of the insured to give notice of the accident as soon as practicable, it is not necessary to a decision of this case to make a conclusion of law on the question of whether or not Billy Don Bowden was a *resident* of the same household as his father, the named insured. However, the issue has been raised, and it seems not inappropriate that I pass on it. No Illinois decisions on this question have been cited to me by counsel, nor do I find any. Nor do I find any decisive Virginia authority on the question. However, I find a number of cases from other jurisdictions wherein the facts were quite analogous.

In Island v. Fireman's Fund, etc., (1947), 30 Cal.2d 541, 184 P.2d 153, it was held that a minor son serving in the Armed Services was *not* a member of the insured's household, this holding being necessary to afford coverage. The court said (p. 156):

"As contended by the insurer, the domicile or legal residence of a person is in no way affected by his enlistment in the Armed Forces in the absence of a contrary intent (citing cases), but these decisions are not

decisive upon the question as to whether military service excludes the enlistee from being a 'member of the household' within the meaning of that term as used in the insurance policy.

"One of the definitions of the word 'household' given in Webster's New International Dictionary is 'those who dwell under the same roof and compose a family; a domestic establishment.' The courts have noted that the term may have different meanings under different circumstances. (citing cases) * * * A federal court declared: Whether the term 'household' or 'family' is used, the term embraces a collection of persons as a single group, with one head, living together, a unit of permanent and domestic character, under one roof, a 'collective body of persons living together within one curtilage, subsisting in common and directing their attention to a common object, the promotion of their mutual interests and social happiness.' In that case, it was held that when two families came together temporarily, 'each family retained its own organization under its own head and did not merge to make one family or one household in any such way as the word is used in the policy.' Lumbermen's Mutual Casualty Co. v. Pulsifer, supra, D.C., 41 F.Supp. 249 at pp. 251, 252.

"A cardinal rule of interpretation is that, where a provision of an insurance policy is susceptible of two constructions, it should be construed most strongly in favor of the policy holder. (citing cases). This rule requires the conclusion that Cave, Jr., was not a member of his father's household at the time of the happening of the accident to Island. If the insurer intended to restrict its coverage to the extent of its definition in the present case, it should have used language clearly stating that purpose."

In Cal.-Farm Insurance Co. v. Boisseranc et al. (1957), 151 Cal.App.2d 775, 312 P.2d 401, the insured's child inflicted injury upon another child. The child was within coverage of his father's insurance if he was a resident of insured's household. The child's parents were separated, and he had been living with his father, the insured, but a few days before the accident, he had gone to live a short while with his mother. It was held the child was a resident of his father's household, which resulted in coverage under the father's policy. The court said (p. 405):

"While the cases do not all appear consistent, it can generally be stated that insofar as the cases involve insurance policies, they can be roughly divided into cases involving policies excluding from coverage of the policies members of the insured's household, and those extending coverage to such persons. Both attempt to apply the rules of construction above discussed. As a result, in the extension cases the questioned terms are broadly interpreted, while in the exclusion cases the same terms are given a much more restricted interpretation. This is necessary, because in both situations the courts favor an interpretation in favor of coverage."

In Shapiro v. Republic Indemnity Co. (1959), 52 Cal.2d 437, 341 P.2d 289, after recovering a judgment against John and Pauline Campbell and their son for personal injuries, plaintiff herein, Mrs. Shapiro, instituted this action against the Campbells' insurer. It appeared that, if the son who was driving his parents' car at the time of the accident had been held to be a resident of his parents' household, there would have been no coverage by reason of the endorsement on the policy that "there is no operator of the automobile under twenty five (25) years of age resident in Named Insured's household. * * * *" The Court held that, since the son was a member of the Armed Services at the time, he was *not* a resident of the Insured's household within the meaning of the endorsement.

In American Universal Insurance Co. v. Thompson, (1963), 62 Wash.2d 595, 384 P.2d 367, it was held that a minor

son who had an accident while driving a non-owned automobile during the period of his Army service and residence at an Army Post was a "resident of same household" as his parents, so that he was within the coverage of his parents' policy.

Referring to two cases involving young men in military service, one holding that the son was a member of his father's household, and the other holding that he was not, the Court said:

"The common denominator in the two cases is that in both, the court upheld the rule that the language should be interpreted more strongly against the insurance company so as to hold that the policy covered the persons involved * * *

" 'These cases illustrate that the interpretation of the terms involved is not fixed, but varies according to the circumstances of the case. They also demonstrate that most courts will interpret the terms so as to extend the coverage, if this can be done under any reasonable interpretation of the facts.' "

The same result is reached in the following cases construing extension clauses: Allstate v. Jahrling, 229 N.Y.S. 707, and Detroit Auto., etc., Co. v. Feys, D.C., 205 F.Supp. 42.

■ Here the situation is unusual. Admittedly, plaintiff Allen is entitled to a judgment against one of the two defendants, the controversy really being between the two insurance companies. It is not necessary for me to give the phrase, "resident of the same household", a broad construction in order to fix liability upon an insurer, nor does it behoove me to give the phrase a narrow construction in order to avoid relief from coverage by reason of an exclusionary clause. It would seem that I should give the phrase a fair, common-sense construction.

■ Undoubtedly, the domicile of Billy Don was his father's home. That was his domicile of origin, and by operation of law continued to be his domi-

cile until and unless he changed it by the acquisition of a domicile of choice. While in the service of the Navy, he never changed his domicile of origin by acquiring a domicile of choice. To acquire a domicile of choice, a man must reside at some place other than his domicile of origin with the intention of making it his permanent home. While Billy Don resided at different Naval stations, there is nothing to indicate that he intended to make any of them his permanent home.

But *residence* and *domicile* are quite different. A man, while in public service may *reside* in the District of Columbia for many years, but as was said in District of Columbia v. Murphy, 314 U.S. 441, 62 S.Ct. 303, 86 L.Ed. 329:

"A man does not acquire a domicile in the District simply by coming here to live for an indefinite period of time while in the Government service. * * * * "

Under the circumstances existing here, it simply does not make sense to me to conclude that, on September 17, 1963, Billy Don Bowden was a resident of his father's household. Prior to his enlistment in the Navy, he had run away from home because of friction with his father. When he came home his father wanted him to go to school. He wanted to get a job. Failing in his search for a job, he *voluntarily* joined the Navy, serving at different Naval stations for more than two years before September 17, 1963. During this two year period, he only visited his father's home on brief leaves of absence. He was not a member of his father's household. He was in no way under the discipline and control of his father. In fact, when the accident occurred, he was disobeying his father in hitch-hiking, when his father had given him money to enable him to return to Norfolk by rail.

■ I have found as a fact that, on September 17, 1963, Billy Don was not a resident of his father's household, so I conclude as a matter of law that, not being a resident of his father's household

at the time of the accident, Billy Don was not within the coverage of his father's liability insurance policy issued to him by State Farm.

Since I have held that Billy Don was not a resident of his father's household, I do not reach the question raised by State Farm's amended answer.

It is my final conclusion that defendant, Maryland Casualty Company, is liable to the plaintiff, Allen, for the amount sued for, and the defendant, State Farm, is not liable to the plaintiff in any amount.