Duncan Trust.

Argued April 25, 1967. Before BELL, C. J., MUS-
MANNO, JONES, EAGEN, O'BRIEN and ROBERTS, JJ.

*William C. O'Toole,* with him *Richard DiSalle, G. Ashton Brownlee,* and *Barley and O'Toole,* for appellants.

*Thomas L. Anderson,* for appellee.

OPINION BY MR. JUSTICE JONES, July 24, 1967:

This is an appeal from a decree of the Orphans' Court of Washington County dismissing exceptions to its adjudication which allowed reformation of a deed of trust of Anne A. Duncan. The facts surrounding the present controversy are as follows:

Anne A. Duncan (Settlor), executed a revocable deed of trust on August 19, 1935 wherein her son-in-law, Walter H. Baker (Baker), and the Union National Bank of Pittsburgh (Union) were named trustees. This particular trust created by Mrs. Duncan was designated by her as the "Baker Trust" since its benefits ran primarily to her daughter—Amy—who had married Walter H. Baker.[1] Under the original terms of the "Baker Trust", Settlor provided for the following scheme of disposition: (a) during her lifetime, Settlor was to receive all of the income; (b) at her death, the income was payable to her daughter—Amy Duncan Baker (Amy)—for life; (c) at Amy's death,

---

[1] In addition to the trust presently in litigation, Mrs. Duncan created a second trust, designated by her as the "Duncan Trust", for the primary benefit of her son, James E. Duncan, Jr. The "Duncan Trust" is not involved in the present litigation.

the income was payable to Settlor's granddaughter— Anne Baker Weimer (Anne)—for life; (d) at Anne's death, the income was payable to her (Anne's) issue, with the further provision that as each issue reached age 35, the trust terminated as to such issue and he or she received an appropriate share of corpus outright; and (e) issue born to Anne *after* Settlor's death were to be placed on the same footing as issue born *prior* thereto.

Settlor amended the "Baker Trust" on two occasions. The purpose of the first amendment, executed on December 10, 1936, was to eliminate a disparity which had occurred in the value of the trust for her son and daughter; to eliminate this disparity, the amendment transferred funds from the "Baker Trust" to the "Duncan Trust". In addition, the first amendment to the trust gave Settlor the express power to revoke and/or amend the original instrument.

On January 4, 1941, Settlor executed a second amendment to the trust and it is this amendment which is the subject of the present litigation. Prior to January 4, 1941, Baker approached Smith W. Whitworth, a member of the Bar and a Trust Officer of Union, and informed him that the Settlor wished to amend the "Baker Trust". Baker informed Mr. Whitworth of Settlor's intentions and asked that Whitworth prepare an amendment to the trust to comply with Settlor's alleged wishes. At this point, it should be noted that Whitworth, although involved with the creation of the original trust, was not the scrivener of the original instrument but was the scrivener of both the first and second amendments; whether or not Baker or the Settlor submitted his drafts of either the first or second amendments to private counsel is unknown. After receiving instructions from Baker, Whitworth drafted an amendment and forwarded it to Baker, *not to Settlor*. On January 4, 1941, Baker returned the draft of the

second amendment—which Mrs. Duncan had already executed—to Whitworth who filed it with other trust papers. *At no time did Whitworth ever talk to the Settlor about the second amendment.* All of his discussions concerning the contents of the amendments and Settlor's intentions were with Baker, his co-trustee.

In the "Whereas" clause of the second amendment, there was a recital that the death of her son, James E. Duncan, Jr., was the reason for the amendment. Although the recital of the purpose of the amendment states such reason, Mr. Duncan's death was completely irrelevant and immaterial insofar as the subject matter of the amendment was concerned and the purpose of the amendment would be the same if he were living or dead. The amendment of January 4, 1941 dealt only with Article I of the "Baker Trust", and it departed drastically from the dispositive scheme set forth in the original trust agreement.

It will be recalled that the original instrument gave the remainder interest in the trust, after the death of the various life tenants, to the issue of Anne Baker Weimer, that the issue were to take free of trust when they attained age 35, and that the original contained a provision that issue born *after* the Settlor's death would share equally with those issue born *before* her death. The disposition of the remainder interest in the trust was changed by the second amendment as follows: (a) at the death of Anne Baker Weimer—the last of the life tenants—the trust was to be divided into two equal parts—one for each of the Settlor's then-living great granddaughters—Amy Anne Weimer and Julia V. Weimer; (b) the two shares were to be held in trust with income payable to the two named great-grandchildren until each attained age 40, at which time they could petition the trustees for $10,000 annually from the principal of their shares while receiving the

income from the balance; and (c) that any children born to Anne Baker Weimer *after* the death of the Settlor should be in the same posture as the two named great-grandchildren, with the exception that such after-born children were to receive their shares of the trust at the age of 21.[2]

It can readily be seen that the effect of a literal reading of the language of the amendment—caused by naming the issue living at the time the second amendment was executed—was to bar any child of Anne born between January 4, 1941 (the date of the amendment) and the date of Settlor's death, February 16, 1943) from sharing in the corpus of the trust. The present problem arises since Anne did, indeed, give birth to a child during this period; Walter Baker Weimer (Walter) was born on December 16, 1942 and thus falls within the class of persons excluded from receiving any interest in the trust under the terms of the second amendment thereto.

On December 10, 1963, the trustees, Union and Anne (as substituted trustee) filed a second and partial account. At audit, the trustees advised the court that their purpose in filing the account was to have the court determine the identity of the beneficiaries who would take at the death of Anne—the then-living life tenant. Further, the trustees advised the court that the question was being raised at that time, since: (a) there was only one living person—the scrivener, now quite elderly—who had knowledge of the facts; and since (b) Walter had just attained majority.

At a hearing held on January 24, 1964, counsel appeared on behalf of Walter and in his praecipe for appearance[3] stated that a scrivener's error had elimi-

---

[2] The amendment provided for other various contingencies none of which are presently pertinent.

[3] Record pp. 32a, 58a.

nated Walter as a remainderman under the "Baker Trust". Counsel's statement on the praecipe concluded with a prayer for reformation of the second amendment.[4] The lower court treated the praecipe for appearance as a formal petition for reformation. At the same hearing, counsel appeared on behalf of Amy Anne Weimer (now Ritter) and the legal guardian of the minor child of Julia V. Weimer Kniseley (now deceased)—the presumptive remaindermen under the second amendment. On April 10, 1964, the court appointed a guardian and trustee ad litem for the minors and unascertained beneficiaries.

After a hearing on April 16, 1964, at which time extensive testimony of the scrivener was received, the Orphans' Court of Washington County filed an adjudication reforming the second amendment so as to include Walter as a remainderman in the same posture with his living sister and the child of his deceased sister. Exceptions to the adjudication, filed by Amy Anne Weimer Ritter and the guardian ad litem, were dismissed by the auditing judge, sitting as the court en banc, and the adjudication was confirmed absolutely. This appeal, by Mrs. Ritter and the guardian ad litem (appellants), followed.

While appellants challenge the lower court's adjudication on several grounds, the main thrust of their attack is that the evidence presented is not as clear, precise and convincing as is necessary to support a decree of reformation of a trust. Since we agree with appellants that the evidence presented does not attain the quality required for reformation, it is unnecessary to address ourselves to any of appellants' other contentions.

We turn to an examination of the instant record with certain well-defined principles in mind: (1) the

---

[4] Ibid.

mistake of a scrivener in preparing a deed, will or other writing may be established by parol evidence and the instrument reformed accordingly: *Huss v. Morris,* 63 Pa. 367 (1870); *Bugen v. N. Y. Life Ins. Co.,* 408 Pa. 472, 184 A. 2d 499 (1962); (2) while generally, the mistake must be mutual, the rule is otherwise where, as herein, the Settlor receives no consideration for the creation of a trust. "In such a case a unilateral mistake on the part of the settlor is sufficient, and it is immaterial that the beneficiary did not induce the mistake, or know of it or share in it."; *La Rocca Trust,* 411 Pa. 633, 639, 192 A. 2d 409 (1963); (3) whether the mistake be unilateral or bilateral, the quality of proof required to establish the existence of the mistake is the same; the proof of the mistake must be established by evidence that is "clear, precise, convincing and of the most satisfactory character." *La Rocca,* supra, at 640; *Easton v. Washington County Insurance Co.,* 391 Pa. 28, 37, 137 A. 2d 332 (1957); and, finally, (4) while it is true that where the auditing judge sees and hears the witnesses, determines their credibility and the weight to be given their testimony, his findings, like those of a jury, will not be disturbed except for clear error; ". . . it is also the law that where a trial judge passes upon the question of whether the evidence introduced to reform a written instrument meets the standard of being clear, precise and convincing his ruling is open to review here." *La Rocca Trust,* supra, at 641.

The testimony presented to the lower court is for the most part that of the scrivener. Our task is to examine his testimony and determine if a scrivener's mistake or error has been shown by "clear, precise and convincing evidence".

For many years, Mr. Whitworth had been a business acquaintance and personal friend of Settlor's son-in-law, Walter H. Baker. In 1935 Baker discussed with Whitworth a possible trust to be established by

the Settlor. Whitworth met with Baker, Settlor and private counsel whom Whitworth had recommended to the Settlor. At this meeting, the terms of the original trust were discussed and agreed upon. Private counsel—not Whitworth—prepared the original trust agreement which Settlor executed in 1935. However, both the first and second amendments were prepared by Whitworth, rather than by Settlor's private counsel, from instructions he received not from Settlor, but from Baker. Whitworth *never* discussed either the first or second amendments with Settlor *personally*. His instructions were received from Baker, and it was with Baker only that Whitworth discussed the contents of the amendments. Whitworth readily admitted that the only time he discussed the provisions of the trust with Settlor was in 1935 at the meeting which we mentioned above.

Whitworth testified that some time prior to January 4, 1941, he was approached by Baker, informed of Settlor's desire to again amend the trust agreement, and asked to prepare an amendment incorporating the changes which Baker said Settlor desired: "Q. Who gave you your instructions in drafting the second amendment? A. Mr. Baker: *I didn't talk with Mrs. Duncan.*" (Emphasis supplied) He described the instructions he received from Baker in the following language: "Q. Now, can you tell us again, I don't recall how your answer was, what were the instructions as to drafting of the amendments? What part of the original were you to amend and in what respect? A. Just the first paragraph of the original agreement. Q. What were you to do with it? A. To name the children of Mr. Baker and provide for succession. Q. Were you told to alter the succession of the trust estate as among Anne Baker Weimer's issue? A. No. Q. What were you told? A. I told Mr. Baker all I could do was to use a draft of the original agreement in redrafting

Paragraph 1. I didn't want to change anything at all. Q. Well, now, the original agreement provided for the succession of the trust estate to the issue of Anne Baker Weimer. Why did you not put that in the amendment? A. Well, I can't give you a very satisfactory answer to that, Mr. Anderson. Q. Was the omitted provision for all the issue amended by mistake of yours, or for what reason? . . . . A. No, there was no other reason. It was felt having the provisions for any after-born children after the death of the grantor would be sufficient." (R. 51a)

Clearly, therefore, scrivener had no personal knowledge of what Settlor intended. The only intent of which Whitworth might have had first-hand knowledge was that of his co-trustee, Baker. The draft of the amendment was submitted to Baker, not Settlor. Whitworth could not possibly have known whether the amendment complied with Settlor's wishes; he only knew what Baker wanted the amendment to accomplish.

Whitworth's testimony also casts doubt upon the question of whether or not there was, in fact, a mistake in draftsmanship. "Q. Was it a mistake? A. She being a very old lady, at that time, past 90, I believe. Q. Was it a mistake of yours to omit a provision for all the issue? A. Well, as it turned out, it could have been better to have it in. . . ." (Record 52a). ". . . Q. Is the general effect then of the amendment to conform to Mrs. Duncan's intents? A. Yes, other than that clause 'D' that you just mentioned. Q. How doesn't it conform to her intent there? A. *Mrs. Duncan didn't know anything about that."* (Emphasis added) (Record 78a-79a).

From an examination of the above excerpts of Whitworth's testimony, it seems obvious that he was merely guessing at the intent of Settlor. Since he did not know what her intention was, he could not possibly know whether, in fact, his draft contained a mistake.

Further evidence of Whitworth's inability to state whether, in fact, there was a mistake, and if so, what it was, is provided by the following excerpt: "Q. Can you explain this omission or mistake? If you can remember. A. It is a bit *difficult* to go back twenty-four years to *remember exactly* what was done in dictating a document of that sort, among others of a similar nature. I think perhaps it was my mistake in not being more specific to my secretary about what to be included in that revised paragraph. We were copying largely from the agreement prepared by Mr. England in the first place and I think that I probably may have said to include the after-born children clause. *But I am not certain about that.* In any event it shouldn't have been in there. Q. Would you call it a mistake in drafting? A. Yes, I *guess* that would be what it would be." (Emphasis added) (Record 79a).

Obviously, Whitworth's testimony does not meet the qualitative test necessary to reform a written trust instrument.

As soon as Walter was born, the scrivener realized that there was a "gap" in the dispositive scheme of the trust and that Walter was excluded from any interest in the trust due to the provisions contained in the second amendment. This fact was conveyed to Baker while Settlor was still alive and the suggestion was made that the matter be corrected. Baker replied that, due to the poor health of the Settlor, he was hesitant to trouble her, saying "we'll have to see what can be done later." (Record 41a). Settlor lived two years after the amendment had been executed and several months after Walter's birth. She knew of Walter's birth and, in fact, knew Walter, since he had been in her home and in her presence on several occasions. Whether or not Baker ever conveyed to her the fact that a gap existed excluding Walter is unknown. However, it is a fact that, despite his awareness of the

problem, Baker neither during Settlor's lifetime, nor his own, attempted to remedy the situation.[5] There is no adequate explanation as to why Settlor did not, during her lifetime, attempt to remedy the situation, if, in fact, there had been a mistake. Nor is there any explanation as to why no remedy was sought during the lifetime of Baker who, presumably, was aware of Settlor's intention.

It is impossible for us to find that the testimony clearly, precisely and convincingly establishes the existence of a scrivener's error or mistake and it is impossible for anyone *now* to know what Settlor's intention was. The Settlor is dead, and thus cannot enlighten us. The only testimony concerning the mistake is that of the scrivener, twenty-three years after the event; who, at no relevant time, discussed the provisions of the amendment directly with the Settlor. The existence of the gap was known, or could have been made known, to all the principals involved in the trust, i.e., the Settlor, the individual trustee and a representative of the corporate trustee. It is apparent from an examination of the record that Mr. Whitworth's memory had failed him with respect to many facets of the transaction surrounding the execution of the amendment. Even if his memory had served him well, his testimony would not be convincing, since he, by his own words, had absolutely no first-hand knowledge of the Settlor's intent.

It is our duty to examine the record and determine if in fact, the testimony meets the standard requisite for a decree of reformation. We must conclude that the lower court erred in its determination that Whit-

---

[5] Appellees attempted to explain Baker's inaction during Settlor's lifetime by implying that she was incompetent. However, the record clearly refutes this position; shortly before Walter's birth, Settlor executed a Codicil to her Will—to which Baker was a witness—which was later probated. (Record 17a).

worth's testimony clearly, precisely and convincingly evidenced that a scrivener's error had eliminated Walter from any interest in the trust.[6] Therefore, we have no alternative but to reverse the lower court.

Decree reversed.

Mr. Justice COHEN took no part in the consideration or decision of this case.

---

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

The majority has proceeded to reverse the decree below under a view of the principles of law which is excessively strict. Neither the facts of the instant case nor the equitable nature of the proceeding justify such strictness in my view.

It seems to me clear enough from the circumstances surrounding the adoption of the second amendment to the trust that a mistake on the part of both the scrivener and the testator has been shown. To begin with, it seems highly probable from a comparison of the trust as it stood before and after the second amendment, that the amendment's primary purpose was to avoid a possible violation of the Rule Against Perpetuities which originally appeared in the trust. The presence of this purpose suggests to me the absence of any other purpose which settlor and her advisers intended the amendment to have. Secondly the majority has suggested no reason, nor is it reasonably possible to imagine one, why the settlor would have changed

---

[6] While we hold the evidence herein presented insufficient to support a decree of reformation, it *might* well be that the language of the present trust instrument would support a finding of an implied gift to appellee. Cf. *Sowers Estate*, 383 Pa. 566, 119 A. 2d 60 (1956); *Lifter Estate*, 377 Pa. 227, 103 A. 2d 670 (1954); *Rouse Estate*, 369 Pa. 568, 87 A. 2d 281 (1952); *Willis Estate*, 7 Fid. Rep. 392 (1957). Since that issue is not now before us nor is the present action the proper medium to present such issue, we express no opinion as to the merits of such a possible interpretation or argument.

the terms of her trust to exclude children born between the date of the amendment and the date of her death, when she included children born after her death. Such an exclusion would be so entirely capricious and frivolous that I believe it constitutes, in the absence of any explanation, strong evidence of a mistake. Thirdly, the high probability of this mistake is made conclusive in my mind by the clear evidence on this record that the scrivener recognized a mistake when he learned of the birth of Walter Weimer in December of 1942. And, as the majority itself points out the record contains no evidence that the settlor was ever apprised of the scrivener's recognition of this gap. To hold a ninety year old lay-woman to have been aware of such a gap on her own, as the majority does, seems to me quite unrealistic.

Finally I would like to observe that the majority falls into error when it assumes that "clear, precise, and convincing" standard is not met because a witness expresses himself with equivocal rather than declarative statements. Given the fact that the scrivener was being put in a position where he was admitting a serious mistake, it seems to me that such equivocal expressions need not necessarily indicate a lack of clarity or conviction by the witness. In any event, it seems to me that the majority infringes the province of the trier of fact when it insists on its interpretation of such expressions which are equally susceptible of the different interpretation put upon them by the trier of fact.

Accordingly, I dissent and would affirm the decree below.