Charles J. BECK, Jr., Plaintiff-Appellant,

v.

PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY, Defendant-Appellee.

Mary M. BRANTLEY, a minor, etc. and M. O. Brantley, Jr., individually, Plaintiff-Appellee,

v.

PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY OF HARRISBURG, Defendant-Appellant.

No. 27930.

United States Court of Appeals, Fifth Circuit.

July 28, 1970.

Rehearing Denied and Rehearing En Banc Denied Oct. 9, 1970.

Edward B. Johnson, Jeanne Heyward, Miami, Fla., Norman A. Share, Homestead, Fla., for Charles J. Beck, Jr.

Paul C. Huck, Peter T. Fay, Ray H. Pearson, Larry S. Stewart, Frates, Fay, Floyd & Pearson, Miami, Fla., for Penn. Nat. Mut. Cas. Ins. Co.

Before GODBOLD, DYER and MORGAN, Circuit Judges.

DYER, Circuit Judge.

In No. 67–435 in the District Court, Charles Beck, Junior, sought to compel Pennsylvania National Mutual Casualty Insurance Co. (Pennsylvania) to satisfy a judgment against Beck, Junior, in excess of the limits of a policy issued to Beck, Senior, entered in a state court action brought by Mary Brantley and her father for her personal injuries suffered as a result of a tragic automobile accident. In No. 68–339 the Brantleys, as judgment creditors of Beck, Junior, sought to recover the policy limits of Beck, Senior's policy issued by Pennsylvania which the Brantleys contend covered Beck, Junior. The actions were consolidated and in a non-jury trial the District Court held that Beck, Junior, was covered by the policy and that the Brantleys were entitled to recover the amount of the policy limits of $25,000.00 together with interest from the date of the state court judgment, costs and attorneys' fees incurred in the District Court action. The Court also held that Pennsylvania was not liable for the amount of the judgment in excess of the policy limits.

Charles Beck, Senior, was the named insured under a Family Combination Insurance Policy issued in Pittsburgh, Pennsylvania, by Pennsylvania[1] with coverage limits of $25,000.00 per person and $50,000.00 per accident. The policy covered "any relative of the named insured who is a resident of the same household."

In his application for insurance Beck, Senior, stated that he and his wife were the only operators of the family automobile and that none of the operators of the vehicle had been involved in an accident. Beck, Senior, told the agent at the time he made the application for the

---

1. At the time of the issuance of the policy Pennsylvania was known as Pennsylvania Threshermen and Farmers' Mutual Casualty Insurance Company.

policy that he did not intend for his son to be covered except when home on ordinary leave from the armed services because Beck, Junior, who was then 19 years old, had been involved in three accidents and was in the "assigned risk category." The policy was accordingly rated "1B–O" which meant that there were no operators under 25 years of age and that no accidents were charged to any of the operators.

On October 18, 1964, Beck, Junior, while driving an automobile owned by William Owens with the latter's permission, lost control of the vehicle in the middle of a sharp "S" curve in Dade County, Florida. The car skidded and crashed through guardrails, turning over several times. Of the seven people in the vehicle five were injured, one was killed and plaintiff-appellee, Mary Brantley, was permanently paralyzed from the neck down. At the time of the accident Beck was in the armed services and stationed at Homestead Air Force Base where he had been assigned since April of 1963.

About two weeks after the accident Beck's father reported it to Pennsylvania's local agent, at the same time telling the agent that he did not think the policy covered the accident. In due course Pennsylvania caused an investigation to be made of the underwriting file, the status of Beck, Junior, the facts and circumstances of the accident, and of the use of the automobile. From the investigation it appeared that Beck, Junior, was not declared to be a resident of the household on the application, which called for a listing of the operators. Beck, Senior, did not seek coverage for Beck, Junior, and there was no coverage afforded the latter. A report from a Florida servicing agency indicated that Beck, Junior, had stated that he had established a residence of his own in Homestead, Florida, and that the Volvo automobile involved in the accident was used regularly by Beck, Junior. Finally, the National Bureau of Casualty Underwriters rating manual provided that "resident of the same household," which

appeared in the senior Beck's policy, did not include "an individual in active military service with the Armed Forces of the United States of America, unless such individual customarily operates the automobile."

Based upon the application, policy, investigation and rating manual, Pennsylvania's vice-president in charge of claims denied liability under the policy for lack of coverage to Beck, Junior.

On February 26, 1965, Mary Brantley and her father brought suit in the Florida courts for damages arising out of the accident. No notice of this suit was given to Pennsylvania nor was any demand made upon it to defend the suit.

Prior to the trial the Brantleys made a settlement offer to Beck, Junior, and his attorney of $25,000.00. Beck, Junior, did not effectuate a settlement nor did he communicate this offer to Pennsylvania. On December 16, 1965, after a non-jury trial, final judgments against Beck, Junior, were entered in behalf of Mary Brantley in the sum of $165,000.00 and for her father in the sum of $26,-141.83 and a cost judgment was thereafter entered in their behalf in the sum of $517.80.

On January 27, 1966, after judgment had been entered in the state court against Beck, Junior, the Brantleys made an offer to settle the judgments for the sum of $25,000.00 in a letter to Beck's attorney. A copy of this letter was sent to Pennsylvania but neither Beck, Senior, Beck, Junior, nor the Brantleys made a direct demand upon Pennsylvania to settle within the policy limits. On April 27, 1967, Beck brought suit against Pennsylvania for the amount of the state court judgments together with $3,500.00 attorneys' fees for defending the state court action, interest from the date of the judgments and attorneys' fees incurred in the District Court. On March 22, 1968, the Brantleys sued Pennsylvania for the policy limits of $25,000.00 plus interest and attorneys' fees.

The District Court concluded that at the time of the accident Beck, Junior,

was a resident of his father's household and therefore covered under the terms of the policy notwithstanding the fact that Beck, Junior, was stationed at Homestead and his father's home was in Pittsburgh, Pennsylvania. Accordingly, the Court held that the Brantleys were entitled to recover the policy limits, interest from the date of the state court judgment and attorneys' fees.

The District Court further held that Pennsylvania was not guilty of a bad faith refusal to settle within the policy limits and, accordingly, entered judgment for Pennsylvania that it was not liable for any of the state court judgment in excess of the policy limits.

## COVERAGE

On this appeal Pennsylvania contends that the District Court erred in holding that Beck, Junior, was covered under the terms of the policy. Pennsylvania first argues that Beck, Junior, was not a resident of his father's household because he was stationed away from home and had established his own residence and that, even if he were to be considered a resident of his father's household, both parties to the contract intended that he was not to be covered and the insurance policy should be made to conform to this intention. Finally, it is urged that the car was furnished for the Junior Beck's "regular use" and was thus excluded from coverage by the terms of the policy. We shall treat these contentions *seriatim*.

Pennsylvania, in support of its argument that Beck, Junior, maintained a separate residence, contends that because Beck, Junior, had chipped in with some friends to pay the rent one time on a house near Homestead, Florida, he established a residence in Florida. Pennsylvania also points out that Beck, Junior, made an application to Dade Junior College of Florida in which he stated that he had been a resident of Florida for at least one year.

■ We are not persuaded that the fact Beck, Junior, once contributed some money for rent on a house leased by a friend shows that he intended to establish a residence there. Especially is this true when he did not keep his personal belongings there and stayed on base except for an occasional overnight stay at the house because it was more convenient than returning to the base from his part-time job. The Dade Junior College application form was adequately explained by the fact that the resident form was for servicemen on active duty as well as those who were bona fide residents of Dade County as both groups were entitled to the same reduced tuition charges.

■ The question thus becomes whether the fact that Beck, Junior, was stationed in Florida operated to make Florida his residence. Since Florida was the forum state in these diversity actions we examine the law of Florida, including its conflicts rules, to determine what law should govern the case. Klaxon Co. v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L. Ed. 1477. Under the circumstances present here Florida courts would look to the substantive law of Pennsylvania, Confederation Life Association v. Ugalde, Fla.Dist.Ct.App.1963, 151 So.2d 315, affirmed in part, reversed in part on other grounds, Fla., 164 So.2d 1, on remand, Fla.App., 163 So.2d 343, cert. denied, 379 U.S. 915, 85 S.Ct. 263, 13 L. Ed.2d 186. Pennsylvania would apply its own law since the policy was issued and delivered there. Moffat v. Metropolitan Casualty Insurance Co. of New York, M.D.Pa.1964, 238 F.Supp. 165; Eastcoast Equipment Co. v. Maryland Casualty Co., 1966, 207 Pa.Super. 383, 218 A.2d 91, 95 n. 5.

■ Unfortunately, Pennsylvania has not decided whether a serviceman changes his residence upon being stationed away from home while in the armed services. We must therefore prognosticate what a Florida judge would think a Pennsylvania judge would think about a question that Pennsylvania judges have not thought about. See Nolan v. Transocean Air Lines, 2 Cir. 1960, 276 F.2d 280, modified, 365 U.S.

293, 81 S.Ct. 555, 5 L.Ed.2d 571. We divine that the Pennsylvania courts would hold that Beck, Junior, was still a resident of his father's household. Not only did Beck, Junior, leave all his personal belongings in his father's house and return home on every leave, he also returned to his father's household for several months after his discharge and tried to find a job. The basis for this *Erie* guess is that we think if the Pennsylvania courts were faced with the issue *sub judice* they would follow the majority rule and hold that where an insured leaves his personal belongings at his former address and does not clearly manifest an intention to change his residence he is still a resident of his former home. *E. g.*, American Universal Insurance Company v. Thompson, 1963, 62 Wash.2d 595, 384 P.2d 367; Giese v. Karstedt, 1966, 30 Wis.2d 630, 141 N. W.2d 886; Detroit Automobile Inter-Insurance Exchange v. Feys, N.D.Cal.1962, 205 F.Supp. 42; *cf.* Allen v. Maryland Casualty Company, W.D.Va.1966, 259 F. Supp. 505.

Pennsylvania next urges that even if the phrase "resident of the same household" is read to include Beck, Junior, it was the clear intention of both the parties to the insurance contract to exclude him from coverage. Pennsylvania argues that it could have obtained reformation of the policy on this ground and, therefore, it should now be available to Pennsylvania as a defense. *Cf.* Presson v. Commonwealth Mut. Fire Ins. Co., 1951, 366 Pa. 436, 77 A.2d 353.

To sustain its reformation argument Pennsylvania points out that both Beck, Senior, and the secretary of Pennsylvania's agent, who took the application and prepared the policy, intended that Beck, Junior, be excluded from coverage except when he was home on ordinary leave. That this was their mutual intention is underscored, says Pennsylvania, by the fact that the policy was rated "1B–O" (no male operators in the household under 25 years of age and no accidents) and rates were charged which did not include Beck, Junior, who, it was admitted, was under 25, had been involved in three accidents and was an assigned risk. These circumstances, Pennsylvania contends, clearly manifest a mutual mistake.

Neither the application nor the terms of the policy specifically excluded coverage for Beck, Junior. It is true that the evidence shows that Beck, Senior, did not intend to cover Beck, Junior, in the policy except when the latter was home on leave.[2] But this is not sufficient for reformation of a contract in equity or variance of the terms of a contract at law. In Pennsylvania reformation is available only when the moving party has shown "by clear, precise and indubitable evidence either fraud or *mutual* mistake." Easton v. Washington County Insurance Company, 1957, 391 Pa. 28, 137 A.2d 332, 337. (Emphasis added). See also, In re Estate of Duncan, 1967, 426 Pa. 283, 232 A.2d 717; Evans v. Marks, 1966, 421 Pa. 146, 218 A.2d 802.

Pennsylvania's evidence is all directed to the intention of Beck, Senior. But there is no "direct, weighty, and convincing," *Easton, supra,* 137 A.2d at 337, evidence bearing on the insurance company's intention. Thus, Pennsylvania has proved, at most, unilateral mistake. It has not met its heavy burden to show *mutual* mistake and therefore would not be entitled to reformation. From the record in this case it seems evident that the secretary, Miss Postek, never considered the fact that while she was issuing a policy that did not cover Beck, Junior, as a regular operator, he would nevertheless be covered as a casual operator of a non-owned automobile

---

2. Beck, Senior, desired to lower his premium cost by excluding coverage for Beck, Junior, and thus get out of an assigned risk classification. As the Pennsylvania policy was actually written the lower rate obtained. Had Beck, Senior, known that Beck, Junior, would be covered while away from home driving a non-owned automobile on isolated occasions without affecting the premium of Beck, Senior, we doubt that he would have had any objection.

while he was in the service and away from home for an appreciable period of time—a rather unusual combination of circumstances but precisely what occurred in this case. We cannot say, however, that she would not have issued the policy as written in any event because the rate would not have been increased. Since reformation would therefore fail, Pennsylvania's defense based thereon must also fail.

Pennsylvania's final contention on the coverage question is that Beck was driving a car furnished for his "regular use" and he therefore fell within a specific policy exclusion. Prior to the accident Beck, Junior, had driven the car very little and each time he did so he was accompanied by the owner. He had use of the car at the time of the accident for only a limited duration. We are convinced that the car was not furnished for his regular use.

We find that the policy afforded coverage to Beck, Junior. The judgment of the District Court in favor of the Brantleys in No. 68–339 is therefore correct.

### EXCESS LIABILITY

Beck, Junior, also contends that Pennsylvania should satisfy that part of the judgment entered against him in excess of the policy limits because Pennsylvania refused to defend the state action, and also because it did not effect a settlement of the Brantley judgment for an amount within the policy limits.

Beck, Junior, concedes that no notice of the pre-trial settlement offer made by the Brantleys was forwarded to Pennsylvania and that neither he nor his father ever made a direct demand on Pennsylvania to settle or defend the state court action. He relies upon the offer to settle within the policy limits made by a letter from the Brantleys' counsel to his own counsel after trial, a copy of which was forwarded to Pennsylvania. We shall deal with the failure to defend and then discuss the failure to settle.

Beck, Junior, contends that no demand to defend was necessary because Pennsylvania, by its letter denying coverage, waived the policy requirement of demand. We agree. *Cf.* Slater v. General Casualty Co., 1942, 344 Pa. 410, 25 A.2d 697; Conrad v. Duffin, 1945, 158 Pa.Super. 305, 44 A.2d 770. But under Pennsylvania law a refusal to defend subjects the insurer only to damages of the "cost of hiring substitute counsel and other costs of the defense." Gedeon v. State Farm Mutual Auto Ins. Co., 1963, 410 Pa. 55, 188 A.2d 320. Here the only evidence by Beck, Junior, on the damages sustained was that his attorney's fee incurred to defend the state court action was $3,500. No evidence was offered by Pennsylvania to prove that the claimed amount was not a reasonable fee for the defense of the Brantleys' suit. It cannot be heard to raise this point now. United States v. Utd. Serv. Auto Ass'n, 5 Cir. 1970, 431 F.2d 735. Under these circumstances Beck, Junior, is entitled to recover damages in the sum of $3500.00 as the cost of hiring substitute counsel to defend the state court action.

Beck, Junior, next urges that under Pennsylvania law the insurer, in making its decision whether to accept a settlement offer, may consider only the merits of the claim against the defendant, *i. e.*, whether there is a good probability that the judgment will be either within the policy limits or the verdict will be for the insured. The insurer, it is argued, may not consider whether the defendant is its insured and if it refuses to settle on that ground, its refusal is in bad faith and will subject it to liability for any excess judgment. In making this contention Beck, Junior, relies on dicta in Gedeon v. State Farm Mutual Automobile Ins. Co., W.D.Pa.1966, 261 F. Supp. 122, modified *sub nom.*, Panizzi v. State Farm Mutual Automobile Ins. Co., 3 Cir. 1967, 386 F.2d 600, in which the court indicated that in a settlement situation the controlling consideration is the merits (and likelihood of a recovery in excess of the policy limits) of the suit against the insured, and is not the insurer's likelihood of prevailing as to the

scope of the coverage of the policy or as to whether it was in force *vel non*. In our view Beck's contention and *Gedeon* are incorrect interpretations of Pennsylvania law.

Cowden v. Aetna Casualty and Surety Company, 1957, 389 Pa. 459, 134 A.2d 223, teaches that the insurer, in considering a settlement offer, is not bound to submerge its own interest but is required only to accord the insured the same consideration that it affords its own interest. See also Bell v. Commercial Insurance Co. of Newark, N. J., 3 Cir. 1960, 280 F.2d 514, construing Pennsylvania law. Obviously, in considering its own interest the insurer may, in good faith, determine whether, under the circumstances, it would be held liable at all, *i. e.*, whether there is coverage. As the court said in *Cowden*: "[*B*]*ad faith, and bad faith alone*, was the requisite to render the defendant liable" for an amount in excess of the policy limits and "bad faith must be proven by clear and convincing evidence and not merely insinuated." *Id.* at 229. (Emphasis in original). The Court there pointed out that in determining bad faith all the facts and circumstances existent at the time the requests for settlement were made must be examined.[3]

When Rigling, the vice president in charge of claims for Pennsylvania, initially made the determination to deny coverage he had before him statements by Beck, Senior, the named insured, to the effect that he did not intend his son to be covered under the policy of insurance, that he had told his son to obtain his own insurance and that he thought his son had done so. Rigling also had a memorandum from the secretary of the local agency to the effect that the policy was written on the basis of no previous accidents, that there were only two operators, Beck, Senior, and his wife, and that there were no male operators under 25 years of age.

Rigling also had before him the report from a local servicing agency in Miami, Florida, which purportedly summarized a recorded statement from Beck, Junior, to the effect that he had rented a house in Homestead and that the owner of the Volvo permitted him to use his car at any time with no restrictions.[4] Finally, Rigling considered Rule 23 of the Private Passenger Automobile Section of a rating manual of the National Bureau of Casualty Underwriters which stated that the term "resident of the same household" did not include an individual in active military service with the armed forces unless such individual customarily operates the automobile.

Rigling discussed the coverage question with several employees of Pennsylvania whom he considered to be experienced men in the field. However, he did not consult an attorney until he was notified of the present litigation.

Viewing the total information before Rigling at the time he made his decision to deny coverage, we agree with the District Court that it was a reasonable decision under the circumstances and one made in good faith. Lack of consultation with an attorney, while a factor to be considered, is not alone decisive. When, as here, the state law on the meaning of "resident of the same household" was, and still is, silent and the named insured explicitly and without contradiction affirmed and reaffirmed that it was his intent to exclude his son from coverage, there can be no doubt that Beck, Junior, did not meet his burden of showing with clear and convincing evidence that Pennsylvania

3. No written demand to settle was ever made in this case. However assuming a proper notice demanding settlement had been made with respect to both offers, the information before Pennsylvania at each time was substantially the same with regard to the coverage issue.

4. Both the verity of this report and the care with which it was prepared by the servicing agency were attacked by Beck, Junior. Granted that it was inaccurate, Pennsylvania nevertheless had no reason to believe at the time, that this independent agency would render an untruthful report, especially since it had employed the same agency in the past with no unfavorable experiences.

refused the settlement offer in "bad faith".

The judgment of the District Court in No. 67–435 is affirmed insofar as it denies recovery to Beck, Junior, of the excess of the limits of the policy issued to Beck, Senior. It is reversed insofar as it denies recovery to Beck, Junior, of the $3,500.00 incurred by him as attorney's fee for the defense of the state court action brought by the Brantleys.

No. 67–435 is affirmed in part, reversed in part.

No. 68–339 is affirmed.