391 A.2d 1051

In re Anne A. DUNCAN TRUST for Anne Baker Weimer.

**Appeal of J. Duncan KNISELEY.**

Supreme Court of Pennsylvania.

Argued March 7, 1978.

Decided Oct. 5, 1978.

Wray Grayson Zelt, III, Washington, Joseph P. Klock, Jr., Steel, Hector & Davis, Miami, Fla., for appellant.

Robert F. Patton, James W. Ummer, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, for appellee.

610

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POM-
EROY, NIX, MANDERINO and LARSEN, JJ.

## OPINION

EAGEN, Chief Justice.

Upon the death of his maternal grandmother, Anne Baker Weimer, on February 11, 1975, appellant, J. Duncan Knise-ley, became entitled to receive one half of the corpus of a trust established by Anne A. Duncan, known as the "Baker Trust."[1] On August 19, 1975, appellee, the Union National Bank of Pittsburgh (the bank), sole trustee since the death of Mrs. Weimer,[2] filed in the Court of Common Pleas of Washington County, Orphans' Court Division, its third and partial account in which it charged against appellant's share of the corpus as compensation for its services the sum of $17,045. Appellant objected that this amount was in excess of the amount which the bank had agreed to charge against corpus when the trust was created. After an evidentiary hearing on the matter, the auditing judge confirmed the amount requested by the bank and subsequently dismissed appellant's exceptions and made his decree final. This appeal followed.

The record reveals that on July 17, 1935, John W. Thompson, then vice-president of the bank, wrote a letter to Walter H. Baker, the husband of the settlor's daughter and the proposed co-trustee of two trusts Anne A. Duncan planned to establish, outlining his understanding of the proposed trusts. In that letter he indicated that if the bank were named corporate trustee its compensation "upon corpus at termination" would be 2% in the "Duncan Trust," not here involved, and 3% in the "Baker Trust," involved instantly. He further noted that "the additional charge upon corpus in the Baker Trust is made on account of the greater length of time it will operate."

1. For additional factual background, see *Duncan Trust*, 426 Pa. 283, 232 A.2d 717 (1967).

2. Mrs. Weimer had succeeded her father, Walter H. Baker, the original co-trustee and the son-in-law of the settlor, after Walter Baker's death in 1947.

On August 14, 1935, however, Mr. Thompson wrote another letter to Mr. Baker, which stated the following:

"Confirming my conversation with you today herewith schedule of compensation to be paid The Union National Bank of Pittsburgh during the continuance of the Baker and Duncan Trusts:—

(1) Securities made up largely of family owned securities with a co-trustee—2% upon income.

(2) When and if sale of family owned securities is made and funds reinvested in approved investments for the trust with a co-trustee—3% upon income.

(3) In the event that all co-trustees named should not act and the entire responsibility devolves upon the bank as sole trustee, its compensation will be—

(a) Securities in the trust made up largely of family owned securities—3% upon income;

(b) Securities in the trust reinvested in approved investments for the trust—5% upon income.

(4) At the termination of the trusts the compensation of the bank upon principal will be *2% based upon the values at which the securities are put upon our books at the time the trusts are established.*" (Emphasis added.)

Thus, the terms of the bank's compensation with regard to corpus were significantly altered by the second letter.[3] Five days later the trusts were established, the corpus of the trust involved instantly consisting of securities, largely of family-owned companies, valued at the time at $159,470.87. The value of the corpus on February 11, 1975, the termination date of the Kniseley portion, was $1,136,084.70. Appellant, however, relying upon the terms of the August 14, 1935, letter, contends that the bank's fee upon termination must be limited to 2% of half the value of the trust at its inception, $1,594.71.

**3.** Copies of both letters were found in the bank's files and made available to the court and appellant at the time of the filing of the account in question.

Section 7185 of the Probate, Estates and Fiduciaries Code, 20 Pa.C.S.A. § 7185, provides in pertinent part as follows:

"(a) When allowed.—The court shall allow such compensation to the trustee as shall in the circumstances be reasonable and just, and may take into account the market value of the trust at the time of the allowance, and calculate such compensation on a graduated percentage.

"(b) Allowed out of principal or income.—Neither the fact that a fiduciary's service has not ended nor the fact that the trust has not ended shall be a bar to the fiduciary's receiving compensation for his services out of the principal of the trust. Whenever it shall appear either during the continuance of a trust or at its end, that a fiduciary has rendered services for which he has not been fully compensated, the court having jurisdiction over his accounts, shall allow him such original or additional compensation out of the trust income or the trust principal or both, as may be necessary to compensate him for the services theretofore rendered by him. The provisions of this section shall apply to ordinary and extraordinary services alike.

"(c) Compensation prescribed by will or other instrument.—Where the compensation of a fiduciary is expressly prescribed either by provisions of a will or deed of trust or other instrument under which he is acting or by provisions of an agreement between him and the creator of a trust, nothing in this section shall change in any way the rights of any party in interest or of the fiduciary."

In his opinion dismissing appellant's exceptions, the auditing judge concluded that Section 7185(c) was inapplicable because there was no valid or enforceable contract fixing the amount of the trustee's compensation. He based this conclusion on two grounds. First, he concluded there was no evidence that Walter H. Baker was authorized to act for the settlor in negotiating the terms of the bank's compensation with the bank's vice-president or that the settlor had agreed to the terms outlined in the vice-president's letter of August 14, 1935. Second, he concluded that even if there was an

agreement between the settlor and the bank, to enforce the contract reflected in the August 14 letter would be contrary to public policy because the evidence indicated that Mr. Baker took advantage of his positions as director of the bank and president of a large steel company, which company was a depositor of the bank, to obtain a "special deal" from the bank not available to its other customers, and because there was a conflict of interest between Mr. Baker's duties as a director of the bank and his desire to reduce the amount of compensation his descendants, as beneficiaries of the trust, would have to pay the bank for its services. Thus, disregarding Section 7185(c) as inapplicable, the judge determined that the amount requested by the bank was reasonable compensation for its services pursuant to Section 7185(a). Alternatively, he concluded that even if there was an enforceable contract, the bank was entitled to the amount requested as compensation for extraordinary services over and above the services contemplated by the parties at the time the trust was created.

The record indicates that, at the beginning of the evidentiary hearing below, both parties stipulated the August 14 letter represented a valid agreement between the settlor and the bank, and that the judge concluded that "the contract has been established." Throughout the hearing both the parties and the judge appear to have proceeded under that assumption. The determination that there was no valid agreement governing compensation and the grounds supporting it appear to have been injected sua sponte into the judge's opinion in support of his decree. In adjudicating the exceptions to his decree, however, the judge was performing an essentially appellate function. It was error for him in this capacity to make a sua sponte determination on the basis of issues not raised or litigated by the parties. See *Coleman v. Board of Education,* 477 Pa. 414, 383 A.2d 1275 (1978); *Wiegand v. Wiegand,* 461 Pa. 482, 337 A.2d 256 (1975). We thus assume that the August 14 letter represented a valid agreement between the settlor and the

bank.[4] We must therefore decide whether the judge erred in determining that the bank was entitled to the compensation requested because in its capacity as trustee it rendered extraordinary services beyond those contemplated or foreseen at the inception of the trust.[5]

It is well settled that where there is a valid agreement between settlor and trustee fixing the terms of the trustee's compensation, courts must ordinarily enforce the terms of the agreement without making an independent determination of whether the terms are reasonable. See *Estate of Breyer*, 475 Pa. 108, 379 A.2d 1305 (1977); *Williamson Estate*, 368 Pa. 343, 82 A.2d 49 (1951). Nevertheless, although this Court seems never to have approved additional compensation where there was an agreement specifically limiting the amount of the trustee's fee, as long ago as *Estate of Hays*, 183 Pa. 296, 38 A. 622 (1897), we intimated that the presence of extraordinary circumstances might compel a different result. An exception to the general rule, in circumstances where the trustee has performed extraordinary services beyond those contemplated by the parties or where the compensation fixed by the agreement is so low that the unwillingness of a competent trustee to continue or undertake to administer the trust would defeat or substantially impair its purposes, is well recognized. Annotation, 19 A.L.R.3d 520 (1968), and cases cited therein; 3 Scott, Trusts § 242.4 (3d ed. 1967). A number of courts in Pennsylvania have awarded additional compensation in such circumstances. See, e. g., *Rea Trust*, 28 Pa.D.&C.2d 433 (O.C. Montg. 1962) (additional compensation from principal

4. Although the bank asserts that both parties were unaware of the August 14, 1935, letter until it was discovered in the bank's files shortly before the instant litigation, its witnesses testified that the bank had collected compensation from income consistent with the terms of the letter throughout the life of the trust.

5. Appellant argues that the bank is barred from seeking relief from the terms of the August 14 letter because it is guilty of laches in asserting its claim. Appellant, however, did not raise the issue of laches in his exceptions to the court's decree; consequently, the issue has been waived. See Pa.R.C.P. 1518; *Danovitz v. Portnoy*, 399 Pa. 599, 161 A.2d 146 (1960).

for extraordinary services); *Carnahan Trust,* 27 Pa.D.&C.2d 744, 12 Pa.Fiduc.Rep. 416 (O.C. Allegh. 1962) (additional prospective compensation from income of charitable trust).

■ In our view, the exception for extraordinary circumstances to the general rule requiring strict compliance with the terms fixed by the parties in their agreement is a salutary and necessary one. We conclude, however, that where a trustee seeks to avoid the terms of the agreement by showing extraordinary services beyond the contemplation or reasonable expectation of the parties, the proof of their extraordinary nature, as well as their extent and value to the trust, must be clear and convincing; it is not sufficient merely to show that the terms agreed upon by the parties no longer appear, with the benefit of hindsight, to be reasonable for the services actually performed. As the Supreme Court of California stated in rejecting a trustee's claim for additional compensation: " . . . the trustee should be required to show in detail the nature and extent of [the extraordinary] services rendered by it . . . and the time and effort entailed thereby over and beyond usual and ordinary services." *Estate of Bissinger,* 60 Cal.2d 756, 771, 36 Cal.Rptr. 450, 459, 388 P.2d 682, 691, 19 A.L.R.3d 506, 519 (1964).

■ Reviewing the auditing judge's findings and conclusions in the light of these standards, we cannot conclude that the bank's evidence was sufficient to establish its entitlement to the additional compensation sought.[6]

The auditing judge summarized the services he determined were extraordinary as follows:

"In 1936 the Bank-Trustee by virtue of the trust's investment holdings in the Universal Steel Company, both common and preferred, and the Cyclops Steel Company became involved in the merger of Universal Steel with

---

**6.** In view of this conclusion, we need not consider appellant's argument that the judge erred in admitting into evidence a memorandum prepared by an employee of the bank purporting to summarize the bank's extraordinary services during the existence of the trust and in permitting the bank's witnesses to rely upon this memorandum.

Cyclops Steel and the exchange of stock held in each company and receipt, evaluation and retention of the capital stock of the successor company, Universal-Cyclops Steel Corporation. Similar extraordinary duties and responsibilities were assumed and performed by the Bank-Trustee with respect to trust holdings in the Citizens National Bank of Washington, Pa., which were liquidated over the period beginning December 21, 1948 through December 23, 1959; the Duncan-Miller Glass Company of Washington, which was liquidated during the period of November 1, 1955 through December 4, 1956; the Pittsburgh Clay Pot Company, which was liquidated with the receipt of payments on February 25, 1947 and February 24, 1948; with each requiring investigations, determinations and actions which could not have been reasonably foreseen at the inception of the trust in 1935.

"An additional service performed by the Bank-Trustee for which no previous compensation was paid from the trust and which could also not have been foreseen in 1935 arose at the death of the settlor of the trust, Anne A. Duncan, in 1943. Although the Bank-Trustee did not. serve in the official capacity as personal representative of the Anne A. Duncan estate, it did during the course of the administration of her estate provide to the personal representatives values of the trust assets, involving detailed analyses and valuations for Universal-Cyclops because of the substantial block of stock owned in the trust, and the Duncan-Miller Glass Company because of the closely-held nature of that stock's ownership. The Bank-Trustee assumed an active role in the administration of the Anne A. Duncan estate as the persona [sic] representatives relied upon its judgment concerning these and other holdings which required careful and detailed financial analysis. The executors looked to the Bank-Trustee to provide sufficient funds from the trust principal to meet death taxes and administrative expenses of the estate due to the lack of adequate funds in the estate. The Bank-Trustee assumed sole responsibility for several aspects of terminating the estate's administration during the period begin-

ning with the Decree of Distribution dated August 31, 1946 and until January 14, 1953 at which time all unresolved matters were successfully disposed of. The Bank-Trustee received no compensation for any of these services.

"Various additional services to those here briefly identified quite apart from anything that might have been foreseen in 1935 as the ordinary duties of the Bank-Trustee were performed during the forty years of the trust's administration without additional compensation being paid to the Bank-Trustee. These included the various negotiations and eventual sale of timberland in Lawrence County, Missouri, over the period of August 31, 1946, until January 14, 1953, which interest came to the trust not through the initial funding in 1935, but rather, from a distribution received from the Anne A. Duncan estate; the negotiations, determinations and eventual involvement in the sheriff's sale of a one-sixth interest in numerous lots in Crafton Borough, Pennsylvania, which interest was through the estate of Anne A. Duncan; the detailed review of the financial statements of the George Washington Hotel Corporation in 1969 and decision to sell the trust's holdings in such, which holdings were distributed to the trust from the Anne A. Duncan estate; the analysis and ultimate sale of holding in the New York and New Haven and Hartford Railroad Company in 1946, which stock was also awarded to the trust from the Anne A. Duncan estate; and numerous other administrative and investment judgments which were never, and could not have been, anticipated either at the time John W. Thompson wrote to Walter H. Baker in August of 1935 or at the time Anne A. Duncan created the subject trust with the Bank-Trustee."

The judge further concluded:

" . . . when it is considered that the extraordinary services that were rendered and made necessary in regard to the steel stock (such as the mergers, etc.) caused the corpus to grow from approximately $159,000.00 to its

present value of over one million dollars, it is the opinion of this Court that the extraordinary services alone were worth at least $35,000.00 which if granted on a pro rata basis would cause the Knisely [sic] share to have $17,-000.00 deducted from it for ordinary services and an additional sum of $17,000.00 deducted for extraordinary services."

Initially, we observe that the judge's finding that the bank's "extraordinary services alone were worth at least $35,000.00" is not supported by the testimony of the bank's own witnesses, who merely testified that the bank's *ordinary* compensation from corpus for a trust of this size would *presently* be $35,000. Nor does the evidence support the judge's finding that the bank's services with regard to the steel mergers *caused* the corpus to grow to its present value.

More significantly, we are unable to conclude that the nature of most of the services summarized by the judge was beyond the contemplation of the parties or not reasonably foreseeable at the time the trust was created. The July 17, 1935, letter from the bank's vice-president indicates that the parties were aware that the "Baker Trust" would likely be of extended duration; because of the size and nature of the trust's holdings, it must have been apparent that the corporate trustee would during this extended period of time be called upon to expend considerable effort with regard to management of the corpus. In particular, the instrument makes specific reference to the possibilities that the trustee might be called upon to participate in mergers and liquidations, to receive additions to the corpus, and to deal in real estate. As for the unanticipated services rendered by the bank following the death of Anne A. Duncan, the bank's witnesses testified that these were rendered gratuitously to the settlor's estate at the request of her executor; although there was testimony that the trust was a legatee of half of the settlor's residuary estate, the bank made no showing that its services to the estate were of any particular value or necessary to the trust.

Indeed, the bank's evidence with regard to most of the services which the auditing judge found extraordinary was lacking in precise detail as to their extent, expense to the trustee, and benefit to the corpus.[7] Compare *Rea Trust, supra.* In this context, we observe that, as the auditing judge noted in his opinion, the amount sought by the bank was only $4.00 more than it would have been entitled to for its ordinary services under the rejected terms of the July 17 letter. Although there appears to be no question that the amount requested would be reasonable compensation from principal to the bank for the services it actually performed were there no agreement, more than this is required to relieve the bank from the terms of the agreement into which, for whatever reasons, it chose to enter.[8]

Finally, we observe that in 1960, after it performed most of the services which it now asserts were extraordinary, the bank did charge the trust $785 for special services in connection with preparing the apportionment calculation, and this amount was approved by the court. Although we do not presume that the bank's failure earlier to seek additional compensation from principal for the services here at issue constituted a waiver of its present right to claim it,[9] its previous failure to do so accentuates the inadequacy of the evidence it presently offers in support of its claim.

7. Rather, the record indicates that most of the corpus's increase in value during the life of the trust was attributable to the growth in value of the steel stock, which the trustees were precluded from selling without the consent of the beneficiaries.

8. Although one of the bank's witnesses testified that under the strict terms of the compensation agreement it could not afford to continue administrating the remaining half of the trust, the judge ruled at the time this testimony was irrelevant to the question of whether the trustee should receive additional compensation for its management of the Kniseley portion of the trust.

9. Compare *Account of Reed,* 467 Pa. 371, 357 A.2d 138 (1976) (no waiver presumed from trustee's failure to seek compensation from principal during her lifetime), with *Card's Estate (No. 2),* 337 Pa. 82, 9 A.2d 557 (1939) (waiver found from 34-year failure to claim additional compensation from income).

620

Accordingly, for the reasons stated above, the decree is reversed and the record remanded for further proceedings consistent with this opinion. Costs on appellee.

MANDERINO, J., filed a dissenting opinion.

MANDERINO, Justice, dissenting.

I dissent. The record sustains the trial court's conclusion that the trustee performed extraordinary services for which it was entitled to compensation.