ALDISERT, Circuit Judge,
dissenting.
Until this ease came along, I thought that this court was bound by our careful and important opinion holding that the equitable doctrine of contract reformation due to a scrivener’s error is consistent with the purposes of ERISA. See International Union v. Murata Erie North America, 980 F.2d 889, 907 (3d Cir.1992). Four years later, the majority gut that decision.
In so doing, the majority embrace arguments from the Pennsylvania Teamsters Health and Welfare Fund that torture the canons of good reason and assault the cardinal axiom of ERISA that the rights and obligations of health and welfare funds stand or fall on what parties agree to in a collective bargaining agreement.
Before us, the Fund argues form over substance and trumpets that it has been prejudiced, even though it has not paid out one penny in accordance with the erroneous written language. Before us, the Fund asserts that theoretical concepts of reliance inhere in the language of the agreement, when in fact the collective bargaining history of the parties since 1983 unquestionably reveals that both the parties to the labor agreement and the Fund have operated on the basis of the intended formula, which the parties have since restored. The Fund’s claim of reliance therefore amounts to an argument aptly described, in the words of the Immortal Bard, as “full and sound and fury and signifying nothing.”[1]
I.
The facts in this ease are simple and undisputed. McCormick Dray is a trucking company that employs union drivers represented by Teamsters Local 764. McCormick Dray and the Local negotiated a series of collective bargaining agreements. Each of these agreements included a provision that McCormick would pay premiums to the Appellant Fund for the purpose of providing medical benefits to the drivers and their families. Pursuant to these agreements, the employees would become eligible for benefits after they worked a specified period of time at McCormick. Prior to 1983, that specified period of time was 30 days.
In 1983, due to the spiraling cost of premiums and the fact that many McCormick employees left after 30 calendar days but before 60 calendar days, McCormick and the Local negotiated a change in the eligibility clause from 30 to 45 days. The Health and Welfare Fund approved the new language. Both McCormick Dray and the Local believed that this eligibility clause was controlling unless subject to further negotiations. Indeed, the next agreement, in 1985, repeated the 45-day eligibility language, as did the 1991 agreement.
Several months before the expiration of the 1985 agreement, however, McCormick and the Local began to negotiate terms for the 1988 agreement. The eligibility clause was never discussed in these negotiations, nor was any change in the clause contemplated by the parties. A contract offer was prepared by McCormick and submitted to the Local, which approved. Thereafter, during the Local’s preparation of the final agreement, the 45-day eligibility language was replaced with language providing for coverage “as of the first day of the month immediately following [an employee’s] employment.” JA 202-03.
Notwithstanding this change in the eligibility period, both parties assumed that the eligibility clause had remained intact; McCormick continued to make contributions to the Fund on behalf of newly hired employees under the conventional 45-day eligibility requirement, and the Fund made no payments in accordance with the erroneous language.
*1111 In August of 1989, the company discovered the error and advised the Local and new employees hired thereafter. Principals of the Local were as surprised as McCormick that the eligibility period in the agreement was not 45 days; indeed, in 1993, the Local and McCormick agreed in writing that the 1988 language did not reflect either parties’ intent. When the 1988 agreement came up for renewal in 1991, the 45-day eligibility requirement again was included, and without negotiation. Thus, the clause under consideration was contained in the original labor agreements of 1983, 1985 and 1991, and, according to a written agreement, was “inadvertently misstated” in the 1988 agreement. These are more than historical facts; this sequence looms large in the subsequent discussion of reliance by the Fund.
The Fund conducted an audit in 1991 and did not attempt to recoup any alleged deficiency until 1993. The filing of its complaint followed on the heels of two developments: McCormick withdrew from the Fund in 1992 when the premium jumped from $277 a month to approximately $400; and the Local requested action by the Fund as a method of putting pressure on McCormick to resolve an unrelated labor dispute.
II.
Under the doctrine of scrivener’s error, a clerical mistake made in drafting a document may be reformed on the basis of parol evidence, provided that the evidence of the mistake is “clear, precise, convincing and of the most satisfactory character” and that the mistake does not reflect the intent of the parties. See In re Estate of Duncan, 426 Pa. 283, 232 A.2d 717 (1967); see also Easton v. Washington County Ins. Co., 391 Pa. 28, 137 A.2d 332 (1957). Here, there is no dispute between the signatories that a mistake has occurred, and the collective bargaining agreement clearly does not reflect the parties’ intent.
We must then inquire whether importing the equitable doctrine of reformation of contract due to a scrivener’s error is available to McCormick here, in an action brought under ERISA by a third party beneficiary to a collective bargaining agreement. To be sure, Section 515 of ERISA requires an employer to contribute to a multiemployer benefit plan in accordance with the “terms and conditions” set forth in the collective bargaining agreement. 29 U.S.C. § 1145. And there is no dispute that, literally construed, the terms and conditions of the 1988 agreement make eligible any employee “as of the first day of the month immediately following his employment.” JA 202-03. Yet applying rules with unfailing technical accuracy is not the aggregate of our responsibility. As Judge Cudahy eloquently stated in Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc., 870 F.2d 1148, 1158 (7th Cir.1989) (Cudahy, J., dissenting), “all rules must admit of equitable exception and modification in appropriate cases lest the tyranny of theory over reality bring about obnoxious results.” And indeed, we have recognized several exceptions to ERISA’s mandate that contract defenses traditionally available against third party beneficiaries are not available against welfare funds. See Agathos v. Starlite Motel, 977 F.2d 1500, 1505-06 (3d Cir.1992) (recognizing three exceptions to this general rule).
This was the philosophy that undergirded our Murata decision, in which Judge Becker, writing for the court, acknowledged that a scrivener’s error exception “would seem at odds with [the statutory purpose of] insur[ing] that ‘every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan.’” Murata, 980 F.2d at 907 (citing Frank v. Colt Indus., Inc., 910 F.2d 90, 97 (3d Cir.1990)). Even so, we decided to east our die on the side of an equitable exception. Thus there is nothing in our jurisprudence governing labor relations or ERISA, as expressed by Agathos and Murata, that endorses the majority’s “tyranny of theory over reality” in bringing about results that are obnoxious to parties of a labor agreement. The precise inquiry that remains, then, is whether the facts in this case should persuade us to eviscerate the central teachings of Murata.
*1112 III.
The majority dismiss the Murata holding because that case “did not involve a suit by a multiemployer fund, nor did it involve a claim for delinquent contributions.” Opinion at 1103. Neither of these distinctions is tenable.
The reason for disallowing the scrivener’s error exception in a multiemployer context, say the majority, is that “multiemployer plans must be able to rely on the plain language of collective bargaining agreements or plans in order to ensure that they have sufficient funds to pay out required benefits.” Opinion at 1106. The majority’s reluctance stems from a multiemployer plan’s concept of multiple fiduciaries with control over a common fund: to allow one employer to bind a fund to pay benefits outside the strict terms of a plan would force all the employers to pay for one employer’s reformation, and insofar as such payments damage the actuarial soundness of the plan, they burden the employees of many other corporations as well.
Whatever may be the legitimacy of this reasoning in the abstract, it is not relevant to the undisputed facts here. Neither other companies in the multiemployer consortium nor the Fund itself were forced to expend one cent, directly or indirectly, on the basis of the 1988 contract reformation. Thus, the basis of the concept in theory had no adverse effect in reality. The reason asserted for artificially engrafting an multiemployer exception to the teachings of Murata is simply not warranted here. The double maxim says it all: cessante ratione, cessat ipsa lex, the rule follows where its reason leads; where the reason stops, there stops the rule.
The Fund neither collected premiums from McCormick nor provided compensation to employees based on a scrivener’s error now subject to equitable reformation. Indeed, McCormick contributed to the Fund consistent with the conventional 45-day eligibility, and the Fund made only corresponding outlays to employees. Thus the Fund here could not possibly demonstrate reliance— whether a kind of de jure actuarial reliance, or a defacto we-paid-out-benefits-in-reliance-on-the-error. Logicians refer to such an argument as the fallacy of irrelevant conclusion, or ignoratio elenchi.
IV.
The majority’s additional reason for not following Murata is that we accepted the doctrine of scrivener’s error in that case because what was at stake was a “windfall.” The majority argue that, because the Fund will entertain claims brought by any McCormick employee who was eligible for benefits under the erroneous eligibility clause, no “windfall” is at stake here. This argument flies in the face of basic economic reality.
I reiterate that the Fund has not made any payments in accordance with the erroneous language. Surely, with the benefit of more than six years of hindsight, the Fund is now fully aware of any potential claims; it can thus calculate effortlessly whether the company’s additional contributions would exceed the Fund’s additional payouts to the employees. Indeed, the filing of this action surely indicates that the simple math has been computed. There have been no payouts whatsoever. Therefore, when, without reliance on the error in the agreement, the Fund seeks to recover additional contributions from McCormick, that’s a windfall.
V.
The Fund never relied on the scrivener’s error, nor does it deserve a windfall. Moreover, in Murata we resolved the fundamental tension between recognizing an exception for scrivener’s error and satisfying the purposes of ERISA. The circumstances presented here provide no reason for decimating a well-reasoned decision of this court.
Accordingly, I would affirm the judgment of the district court. I dissent.

. W. Shakespeare, Macbeth, Act V., Scene 5, lines 32-33.